

1997 Decisions

Opinions of the United
States Court of Appeals
for the Third Circuit

1-15-1997

# Union Pacific RR v. Ametek Inc

Precedential or Non-Precedential:

Docket 96-7015

Follow this and additional works at: http://digitalcommons.law.villanova.edu/thirdcircuit_1997

Recommended Citation

"Union Pacific RR v. Ametek Inc" (1997). *1997 Decisions.* Paper 13.
http://digitalcommons.law.villanova.edu/thirdcircuit_1997/13

This decision is brought to you for free and open access by the Opinions of the United States Court of Appeals for the Third Circuit at Villanova University School of Law Digital Repository. It has been accepted for inclusion in 1997 Decisions by an authorized administrator of Villanova University School of Law Digital Repository. For more information, please contact Benjamin.Carlson@law.villanova.edu.

UNITED STATES COURT OF APPEALS
FOR THE THIRD CIRCUIT

————————————

No. 96-7015

————————————


UNION PACIFIC RAILROAD CO.; MISSOURI PACIFIC RAILROAD CO.;
NORFOLK AND WESTERN RAILWAY CO.; SOUTHERN RAILWAY CO.; BURLINGTON
NORTHERN RAILROAD CO.; CONSOLIDATED RAIL CORPORATION;
CSX TRANSPORTATION CO.

v.

AMETEK, INC.; UNITED STATES OF AMERICA;
SURFACE TRANSPORTATION BOARD


Union Pacific Railroad Co.; Missouri Pacific Railroad Co.;
Norfolk & Western Railway Co.; Southern Railway Co.; Burlington
Northern Railroad Co.; Consolidated Rail Corporation,
Appellants.

————————————

An Appeal from the United States District Court
for the Middle District of Pennsylvania
D.C. No. 90-cv-1396

————————————

Argued September 18, 1996

Before: NYGAARD, ROTH, AND ROSENN, <u>Circuit Judges</u>

Filed January 15, 1997

————————————

Paul D. Keenan, Esquire (argued)
Buchanan Ingersoll, P.C.
Two Logan Square, 12th Floor
18th and Arch Streets
Philadelphia, PA 19103
Counsel for Appellants

James E. Howard, Esquire (argued)
William R. Matthews, Esquire
Kirkpatrick & Lockhart, LLP
One International Place
Boston, MA 02110-2637
Counsel for Appellee Ametek, Inc.

Anne K. Bingaman, Assistant Attorney General

John J. Powers, Esquire
John P. Fonte, Esquire
Department of Justice
Washington, DC 20530
Counsel for Appellee United States of America

Henri F. Rush, General Counsel
Evelyn G. Kitay, Esquire (argued)
Surface Transportation Board
Washington, DC 20423-0001
Counsel for Appellee Surface Transportation Board

———————————————

OPINION OF THE COURT

———————————————

ROSENN, Circuit Judge.

The appeal in these consolidated cases raises questions of first impression in this circuit relating to the symbiotic power of a United States district court and the Interstate Commerce Commission (ICC)[1] to render judgment for demurrage fees[2] against an entity which is not a party to any transportation contract with a railroad. The plaintiffs, six national freight carriers (the Interline Railroads) sued Ametek, Inc. in the

1. The ICC Termination Act of 1995 (ICCTA), Pub. L. No. 104-88, 109 Stat. 803, abolished the ICC and transferred many of its rail functions to the Surface Transportation Board (STB). The demurrage functions at issue in this proceeding which were formerly performed by the ICC are vested in the STB by virtue of 49 U.S.C. § 11122, as reenacted by the ICCTA. We will refer to the agency as the ICC.

2. As to railroads, demurrage is "a charge exacted by a carrier from a shipper or consignee on account of a failure to load or unload cars within the specified time prescribed by the applicable tariffs . . .." Black's Law Dictionary 432 (6th ed. 1990). Railroads charge shippers and receivers of freight "demurrage" fees if the shippers or receivers detain freight cars on the rails beyond a designated number of days.

2

United States District Court for the Middle District of Pennsylvania to recover $297,270 allegedly due under a demurrage tariff issued by the Panther Valley Railroad Company (Panther Valley), now defunct. Panther Valley had assigned its demurrage claim against Ametek to the Interline Railroads. Ametek receives plastic materials by rail at Nesquehoning, Pennsylvania which it processes and then ships by rail to the material suppliers' customers.

The district court, on motion of Ametek, referred one issue to the ICC: the reasonableness of a demurrage charge. The ICC, however, determined preliminarily that the tariff had no application to Ametek because it was neither the consignor nor consignee of the shipped goods, and had not assumed contractual liability. The district court adopted the ruling of the ICC and concluded that Ametek had not entered into any separate agreement obligating it to pay the demurrage fees. It therefore entered summary judgment for Ametek and the ICC and denied the Interline Railroads' motion for summary judgment. We affirm.

## I.

The demurrage charges assigned by Panther Valley allegedly accrued under its tariff during 1987 through 1989 inclusive.[3] Ametek's customers ship the raw materials by rail to

---

3. The plaintiffs premise jurisdiction in their action on 28 U.S.C. § 1337. We have jurisdiction under 28 U.S.C. § 1291, this being an appeal from a final judgment.

Ametek's plant by private rail car.  Panther Valley and its predecessor had provided rail service over a period of about eight years without demurrage charges.  The practice of Ametek's customers was to alert Ametek as to whether the loaded cars should be delivered to Ametek promptly or be held on Panther Valley's tracks for later delivery.

In 1986, Ametek had a need to store privately owned empty and inbounded loaded rail cars for extended periods of time.  The president of Panther Valley initiated discussions with  Ametek's rail consultant concerning a side track agreement between Ametek and Panther Valley for such cars.  Eventually on April 22, 1996, Panther Valley's president submitted a proposed side track agreement to Ametek's vice-president in which Ametek would lease track to accommodate a seasonal overflow of rail cars experienced by Ametek.  In August 1986, the president of Panther Valley sent a letter to Ametek setting forth the terms of a second proposed side track lease agreement.  Ametek would pay Panther Valley 65 cents per car per day stored on Panther Valley track.  For reasons unknown to all involved, the agreement "fell through the cracks" and was never signed.  All parties concede that if the agreement were in force, Ametek would not be liable for demurrage fees.

In 1987, Panther Valley unilaterally imposed a demurrage tariff of $20 per car per day for the first two days that a company held rail cars beyond a free period of 48 hours.

4

The tariff increased to $30 for each of the next two days, and $40 for each subsequent day. The parties disagree as to whether Ametek was informed of this tariff.

In the face of severe financial problems, Panther Valley, in January 1990, billed Ametek for $297,270 in demurrage fees for the period March 15, 1987 through October 2, 1989. Ametek refused to pay the invoice, and suggested that the fair way to handle the storage problem would be to calculate the amount Ametek would owe under the aborted lease agreement, which amounted to $29,664.60. Panther Valley rejected this proposal because it would not be in its "best financial interest." In June 1990, Panther Valley ceased operations and assigned the claim to its creditors, six freight carriers (the Interline Railroads).

On July 23, 1990, the Interline Railroads brought this action for demurrage allegedly accrued between March 15, 1987 and October 2, 1989 (Ametek I). In response to a motion by Ametek, the district court stayed its proceedings and referred one issue to the ICC: the reasonableness of Panther Valley's demurrage charges. The court specifically retained jurisdiction over all other issues. Subsequently, Ametek filed a separate complaint with the ICC claiming that the demurrage rates and practices were unreasonable. The ICC consolidated the proceedings.[4]

_____
4. Because the ICC never issued any ruling pertinent to the unreasonable practices complaint, the matter became moot and is not relevant to this appeal.

The ICC stated that before it could determine if the charges were reasonable, a threshold issue required that it determine if the tariff could be applied to Ametek at all. Finding that Ametek was merely the agent of its customers and neither the consignor nor consignee, the ICC concluded that Panther Valley could not impose demurrage fees on Ametek. The ICC relied on Middle Atlantic Conference v. ICC, 353 F. Supp. 1109, 1116-1121 (D.D.C. 1972) (demurrage tariff does not apply to agent of party to transportation contract). The ICC found that Ametek did not receive, process, or distribute its own materials, and that Ametek generally was not the consignor or consignee designated on the bills of lading.

The Railroads challenged the ICC decision in the United States District Court pursuant to 28 U.S.C. § 1336(b) by filing another and separate complaint against the ICC (Ametek II). The court consolidated Ametek II with Ametek I. The ICC, Ametek, and the Railroads moved for summary judgment. The court found that the ICC properly addressed the threshold question whether the tariff applied to Ametek. The court determined that the ICC properly concluded that a demurrage tariff did not apply to a company that is not a party to a contract of transportation. The court then granted summary judgment for ICC and Ametek. The Railroads timely appealed to this court.

II.

6

Before we discuss the substantive issues raised by the appellants, the Interline Railroads, we turn to the threshold question of the jurisdiction of this court to hear this appeal. Ametek contends that the district court lacked jurisdiction over Ametek II because the action did not arise out of the question referred by the district court as to the reasonableness of the demurrage charges.[5]  Thus, it maintains that the district court lacked subject matter jurisdiction pursuant to 28 U.S.C. § 1336(b), and this court therefore cannot exercise appellate jurisdiction.[6]

This court exercises plenary review over matters of jurisdiction.  Anthuis v. Colt Indus. Operating Corp., 971 F.2d 999, 1002 (3d Cir. 1992).  Title 28 of the United States Code provides:

When a district court . . . refers a question or issue to the Interstate Commerce Commission for determination, the court which referred the question or issue shall have exclusive jurisdiction of a civil action to enforce, enjoin, set aside, annul, or suspend, in whole or in part, any order of the Interstate Commerce Commission arising out of such referral.

5.  If the district court lacked jurisdiction over this matter, then principles of res judicata would preclude the Railroads from pursuing their collection action against Ametek, because the time period has long since elapsed during which the Railroads could appeal the ICC determination in Ametek's favor.  See infra note 6.

6.  Under the Hobbs Act, 28 U.S.C. §§ 2321(a) and 2342, ICC orders are directly reviewable in the court of appeals.  Under 28 U.S.C. § 2344, the petition to review must be filed within sixty days after the entry of the order.  No such petition was filed in this case, and thus we would lack original jurisdiction.

7

28 U.S.C. § 1336(b) (1994) (emphasis added).

The district court referred the question of the reasonableness of Panther Valley's demurrage rates to the ICC. The ICC, however, did not directly reach this question, because it determined that the demurrage tariff did not apply to Ametek in the first instance. Under § 1336(b), if the question whether the tariff applied to Ametek arose out of the referred issue as to the reasonableness of the charges, then the district court properly exercised jurisdiction over the instant case.

The district court itself declined to decide whether it had jurisdiction, stating in a footnote that jurisdiction was "far from clear." (Union Pac. R.R. Co. v. Ametek, Inc., No. 90-1396 at 27 n.18 (M.D. Pa. Sept. 8, 1995) (mem.)). The court's primary concern was that the ICC's decision regarding the threshold applicability of the tariff may have arisen from the separate complaint filed by Ametek with the ICC challenging the reasonableness of the tariff rates and the tariff practices pursued by Panther Valley, rather than from the issue that the district court referred to the ICC.

In addressing a similar question in Railway Labor Executives' Ass'n v. ICC, 894 F.2d 915, 917 (7th Cir. 1990), Judge Posner noted:

The insight behind section 1336(b) is that if a
     question within the purview of the ICC arises
     in the course of a district court proceeding,
     submission of the ICC's answer in the first
     instance to the district court rather than to
     the court of appeals will avoid a cumbersome

8

and potentially protracted bifurcation of judicial review.

We do not believe that Congress predicated the exclusive jurisdiction of the district court under 28 U.S.C. § 1336(b) on the circumstance that the district court itself must invoke the jurisdiction of the ICC by making the referral.  We think the essence of the section is that the district court should have exclusive jurisdiction over review of the referred matter even if a party invokes the jurisdiction of the ICC whenever the district court makes a referral to the agency.  This interpretation of the law avoids problems arising out of parallel proceedings in different courts arising out of a single controversy.

In its ruling in this case, the ICC stated that "[w]hile the primary issue raised by the court referral is the reasonableness of the demurrage charges, before we analyze the reasonableness of charges we must determine if the demurrage charges apply.  If demurrage charges do not apply, their reasonableness is not an issue." Ametek, Inc. v. Panther Valley R.R. Corp., No. 40664 at 3 (ICC Jan. 15, 1993) (decision & order) (citations omitted).  This is a common sense and logical approach to an analysis of the reasonableness of the charges and the relationship between the Railroads and the alleged debtor.

Citing to Island Creek Sales Co v. ICC, 561 F. 2d 1219 (6th Circuit 1977), the dissent suggests that we are interpreting § 1336(b) "loosely."  Dissent at 4.  Island Creek, however, did

9

not construe § 1336(b) and dealt only with the interpretation of § 1336(a).  Interpreting that section, the Court of Appeals for the Sixth Circuit concluded that the petitioners in the case before it sought "more than money.  They challenge the fundamental power of the Commission to issue Car Service Order No. 1050 and the method used to promulgate the demurrage increases."  Id at 1222.  Thus, this case from a sister circuit has no precedential or persuasive value.

The dissent also cites Empire-Detroit Steel Division of Cyclops Corp. v. ICC, 659 F.2d 396 (3d Cir. 1981), for the proposition that this court has "adopted Island Creek's strict interpretation of the district court jurisdiction under § 1336(a)."  Dissent at 4.  Far from supporting the dissent's position, Empire-Detroit merely reiterates the widely accepted view that review of ICC decisions which are based upon "legal or policy grounds" lies with the court of appeals.  Empire-Detroit, 659 F.2d at 397.  In the case at bar, the ICC decision was based largely upon a factual determination and upon a related matter emanating from a referral by the district court.  It had no effect upon the public at large or the powers and policies of the ICC.

We conclude that the ICC's decision can fairly be characterized as related to and arising out of the district court's referral and that the district court properly exercised jurisdiction over Ametek II.  They were parallel proceedings

10

arising out of a single dispute and the district court's exercise of jurisdiction avoided "cumbersome and potentially protracted bifurcation of judicial review."  We therefore hold that the district court had subject matter jurisdiction over this matter pursuant to 28 U.S.C. § 1336(b), and that we have appellate jurisdiction under 28 U.S.C. § 1291.

### III.

We next consider whether the district court applied the correct standard of review to the ICC ruling.  In its opinion granting summary judgment for the ICC and Ametek, the district court stated that "[b]ecause it is evident that the ICC was not engaged in tariff interpretation, but instead applied its policy to an otherwise uncontested determination that Ametek was not a party to a contract of transportation, judicial review is properly limited to ascertaining whether the ICC decision is arbitrary, capricious or an abuse of discretion." Union Pac. at 22.  The Railroads argue that the court should have reviewed the ICC's decision de novo because the ICC was merely interpreting common law agency principles.

In Hi Craft Clothing Co. v. NLRB, 660 F.2d 910, 915 (3d Cir. 1981), this court stated that when an issue falls outside of an agency's area of expertise, and the courts have special competence in that area, there is little reason for the court to defer to the agency's interpretations.  And in the instant case,

11

the ICC acknowledged that the "courts are the primary authority on matters such as agency and contract law." Panther Valley at 4. However, the application of agency law was not necessary to the ICC's determination.[7] The Railroads concede in their brief to this court that "[t]he bills of lading . . . in almost all cases listed Ametek as the agent for the consignee or the consignor." Although the district court correctly applied the abuse of discretion standard, we also note that, in fact, the court engaged in a far more searching analysis of the ICC determination. We conclude that the ICC merely applied its own policies to uncontested matters of fact, and that the district court committed no error in its standard of review.

IV.

We turn now to the central issue in this case: Whether the district court erred in accepting the ICC's determination that the Panther Valley demurrage tariff could not be applied to Ametek. This inquiry involves two separate questions. First, did the court err in adopting the ICC's conclusion that the demurrage tariff may not be applied to Ametek because Ametek was not a party to the underlying transportation contracts? Second,

_____

7. Indeed, it might be argued that a finding of agency was superfluous; that it would have been sufficient simply to determine that Ametek was not a party to the day to day transportation contracts. See, e.g., Southern Pac. Transp. Co. v. Matson Navigation Co., 383 F. Supp. 154, 157 n.5 (N.D. Cal. 1974).

12

did the court err in concluding that no other contractual basis exists which would allow the Railroads to apply the tariff?

A.

In its memorandum opposing the Railroads' motion for summary judgment, the ICC recites its "longstanding policy not to extend demurrage tariffs to persons who are not parties to the transportation contract."[8] The ICC decision itself states that "the Commission has applied this legal principle in a number of cases," and cites particularly to Payment of Detention Charges, Eastern Central States, 332 I.C.C. 585, 588 (1968), aff'd 335 I.C.C. 537 (1969) (unlawful to "place liability for detention charges[9] upon a person not a party to the contract of transportation").

With little federal court precedent upon which to draw, both the ICC and the district court in this case relied primarily upon Middle Atlantic Conference v. ICC, 353 F. Supp. 1109 (D.D.C. 1972) (unlawful to impose liability for demurrage charges upon agent who was not a party to the transportation contract). After

_____

8. The policy extends at least as far back as 1920. See New York Board of Trade v. Director General, 59 I.C.C. 205, 209 (1920) (noting that a "steamship company is not a party to the contract of transportation over the rail lines and cannot be held liable by the rail carrier for demurrage").

9. "Detention" and "demurrage" are terms used by motor carriers and railroads, respectively, to describe the same thing. The legal principles discussed apply to both motor carrier detention and railroad demurrage charges.

13

speaking approvingly of the Eastern Central decision, the court in Middle Atlantic noted that "[t]he law is well settled that an agent for a disclosed principal is not liable to a third person for acts within the scope of the agency." 353 F. Supp. at 1120-21 (citations omitted).

In the instant case, it is undisputed that Ametek was not a party to the transportation contracts. We therefore perceive no error by the district court in adopting the ICC's determination that liability for the demurrage tariff could not be imposed on Ametek as the consignee or an agent of the consignor.

B.

The Railroads argue that the ICC and the district court failed to address an exception to the general rule as stated in Part IV A supra: that agents may assume liability contractually. The Railroads assert that Ametek separately agreed to the demurrage liability in the instant case. This court reviews the district court's finding of facts for clear error. See North River Ins. Co. v. CIGNA Reinsurance Co., 52 F.3d 1194, 1203 (3d Cir. 1995).

The court in Middle Atlantic stated the exception to the rule of non-liability for agents: "Certainly warehousemen are free to assume liability for detention charges by contractual undertaking . . .. " 353 F. Supp. at 1121-22. The Railroads

14

contend that Ametek independently agreed to be liable for the demurrage tariffs. They assert that Ametek hired a railroad consultant and negotiated the failed lease agreement to avoid the demurrage costs. Thus, the Railroads conclude that Ametek was aware of its liability, and chose to limit it through a negotiated agreement. In the absence of the track or lease agreement, they argue, Ametek is liable for the full demurrage cost.

The district court noted that an agent may agree to be liable for demurrage charges, but found that there was no such agreement between Ametek and Panther Valley. The court discussed the proposed rental agreement between the parties, but pointed out that the parties never signed the agreement and aborted it. The court noted that the Railroads presented no evidence that Ametek ever intended to agree to demurrage fees. Past dealing between the parties reveal that neither Panther Valley nor its predecessor, Conrail, ever charged Ametek with a demurrage tariff. Further, as the district court noted, Panther Valley was free to seek demurrage charges from Ametek's clients, the actual parties to the shipment contracts.

We find no error in the district court's finding of fact that Ametek and Panther Valley never entered into a contract binding Ametek to the payment of demurrage fees. There is no evidence that Ametek intended to assume contractual liability for the demurrage charges. We have only a proposed draft of a

15

contract which was never signed and is thus, of course, unenforceable. Neither we nor the district court are in a position to speculate as to Ametek's motivations in entering into the contract negotiations. We see no error in the district court's decision that no contractual exception to the agent non-liability rule is present in this case.

V.

We conclude that the district court committed no error in adopting the ICC's determination that Ametek may not be held liable for demurrage charges under Panther Valley's tariff. Ametek was not a party to the underlying transportation contracts, and it did not separately agree contractually to accept liability.

Accordingly, the summary judgment in favor of the ICC and Ametek will be affirmed, as will the order of the district court denying the motion of the Interline Railroads for summary judgment. Costs taxed against the appellant Railroads.

<u>Union Pacific Railroad, et al. v. Ametek, Inc.</u>

No. 96-7015

_____

_____

_____

Roth, <u>Circuit Judge</u>, Dissenting:


I respectfully dissent from the majority's opinion because I do not think the district court had jurisdiction to review the ICC's order in this case.

Except as otherwise provided by Congress, Title 28 U.S.C. §2321 vests exclusive jurisdiction in the federal courts of appeal to "enjoin or suspend, in whole or in part, a rule regulation, or order" of the Interstate Commerce Commission (now Surface Transportation Board). 28 U.S.C. §2321. In addition, under 28 U.S.C. §2342(a), "The court of appeals . . . has exclusive jurisdiction to enjoin, set aside, suspend (in whole or in part), or to determine the validity of ... (5) all rules, regulations or final orders of the [ICC] made reviewable by §2321 of this title." As these statutes demonstrate, the courts of appeal ordinarily have jurisdiction over cases in which a party seeks to challenge an ICC decision.

17

I recognize that there are exceptions to this general rule. For example, under 28 U.S.C. §1336(b), a district court retains exclusive jurisdiction over a civil action to review an ICC order when that order arises out of a prior referral. However, I conclude that the ICC's order in this case does not fit the "arising out of" language of § 1336(b).

Ametek initially sought to have the district court refer two issues to the ICC: the reasonableness of Panther Valley's rates and the reasonableness of Panther Valley's practices in negotiating a contract to force Ametek to pay demurrage charges. The district court, however, specifically limited its referral to one issue, the reasonableness of Panther Valley's rates. Ametek then filed a separate proceeding directly with the ICC regarding the reasonableness of Panther Valley's practices. The ICC consolidated this separate proceeding with the issue already referred to it by the district court. The ICC then issued an opinion declaring Ametek not liable for demurrage charges under common law principles. The ICC did not rule on the reasonableness of Panther Valley's rates.

I disagree with the majority that the ICC's decision regarding Ametek's liability for demurrage charges arose out of the district court's referral within the meaning of §1336(b). True, the ICC may have felt that a decision regarding the reasonableness of Panther Valley's rates dictated a determination of whether the rates applied at all. Nevertheless, the ICC's

18

legal authority for making this determination did not originate in the district court referral.  It was specifically presented to the ICC in Ametek's separate action filed directly with the ICC.

Moreover, the ICC acknowledged that it was going beyond the scope of its expertise and, indeed, beyond the specific referral from the district court when it stated:

> We are aware that courts are the primary authority on matters such as agency and contract law.  However, where the applicability and reasonableness of interstate railroad transportation contracts are at issue, our expertise and precedents are also due consideration.  See 49 U.S.C. 10501(d).

The ICC's invocation here of 49 U.S.C. §10501(d) is significant because it demonstrates that the Commission was relying not on the district court's referral, but on the ICC's own inherent authority to review the rules and practices of rail carriers.[10]

Furthermore, when the district court affirmed the ICC's authority to consider the issue of liability, the district court suggested that it was Ametek's separate complaint which provided the ICC with the authority to rule on Ametek's liability for the charges.  The court first noted that

---

[10]§ 10501(d) states in pertinent part: "The jurisdiction of the Commission . . . over transportation by rail carriers, and the remedies provided in this subtitle with respect to the rates, classifications, rules, and practices of such carriers, is exclusive."

> [B]ecause 49 U.S.C. §11701(b) permits the ICC to dismiss only those complaints filed with it that fail to "state reasonable grounds for investigation and action," the ICC was statutorily obligated to address the separate complaints filed by Ametek.

Union Pac. R.R. Co. v. Ametek, Inc., No. 90-1396 at 15 (M.D. Pa.

Sept 8, 1995) (mem.). The district court went on to state:

> Notwithstanding the parties' agreement that this Court has jurisdiction over the ICC Decision pursuant to 28 U.S.C. § 1336(b), I am constrained to note that jurisdiction is far from clear. . . . Only the reasonableness of demurrage rates was referred to the ICC in this case. While it may have been proper for the ICC to address the threshold question of tariff applicability, that issue was presented as a result of separate complaints filed by Ametek. It thus could be argued that the ICC Decision does not arise out of the referral in this case, so that any challenge to the ICC Decision should have been pursued in the appropriate court of appeals.

Union Pac. R.R. Co., No. 90-1396 at 27 n.18 (emphasis added). I agree with the district court's statement that one could argue that the ICC's authority to consider Ametek's liability for demurrage charges did not stem solely from the district court's referral. In fact, the ICC's authority to consider the reasonableness of Panther Valley's practices stemmed from Ametek's separate proceeding filed directly with the ICC. I conclude, as a consequence, that the district court lacked jurisdiction to review the ICC's order under §1336 (b).

My conclusion is supported by a similar situation which the Sixth Circuit confronted in Island Creek Sales Co. v. I.C.C., 561 F.2d 1219 (6th Cir. 1977). In Island Creek, the court interpreted the scope of the jurisdiction under 28 U.S.C. §1336(a), which provides for district court review of ICC orders

20

that concern the payment of money or collection of fines. The shippers challenged the ICC's power to promulgate certain demurrage increases. Since the case involved the validity of the ICC's order for the payment of money and not just the amount payable, the Sixth Circuit held that the case was within the appellate court's exclusive jurisdiction. Id. at 1222. The nature of the issue to be reviewed -- the ICC's power to promulgate increases and not merely the amount of the increase -- placed the appeal beyond the scope of the narrow jurisdictional exception created for the district court by § 1336(a).

Island Creek is analogous to this case because it involves the scope of the jurisdiction for district court review created by §1336. Moreover, we have adopted Island Creek's strict interpretation of district court jurisdiction under §1336(a) in Empire-Detroit Steel Division of Cyclops Corp. v. I.C.C, 659 F.2d 396 (3d Cir. 1981).[11] I see no reason to apply a strict interpretation to §1336(a) and a looser interpretation to §1336(b). The majority seem, however, to interpret §1336(b) loosely. I believe to the contrary that we should interpret §1336(b) strictly and limit district court appellate jurisdiction to the express language of the statute.

_____

[11]In Empire-Detroit we stated: "We agree with those courts of appeals which have held that review of orders denying reparations on legal or policy grounds is available by petition for review in the courts of appeals." Empire-Detroit, 659 F.2d at 397.

21

Finally, I disagree with the majority's reliance on Judge Posner's opinion in <u>Railway Labor Executives' Association v. I.C.C.</u>, 894 F.2d 915 (7th Cir. 1990). In <u>RLEA</u>, the Seventh Circuit interepreted the referral language of § 1336(b) and concluded that district courts must make some positive "reference" to the ICC in order to invoke the referral jurisdiction provided by the statute. The purpose of such a reference is "so that the parties can be in no doubt of which court to go to for judicial review of the ICC order." <u>Id.</u> at 917.[12] In a situation such as the case before us, where the ICC has simultaneously considered a question referred by the district court and a proceeding filed directly with the ICC, it seems to me that a bright line rule is most helpful to the parties in determining where to file an appeal. I submit that only those issues should be appealed to the district court which were expressly referred to the ICC by the district court. I do not concur in the majority's implication that the word "order," as it is used in §1336(b), is broader in scope than the word "issue." To the contrary, I believe the statute provides for district court review of solely those issues it has referred to the ICC. Any other issues decided by the ICC in a parallel proceeding, such as we have here, should be appealed to the court of appeals.

---

[12]The issue in <u>RLEA</u> was whether the transmittal of a question by the bankruptcy court to the ICC was a "referral" if the word "refer" was not employed. The court concluded that it was a referral.

22

The application of such a strict interpretation of §
1336(b) would reduce the chance that appeals are made to the
wrong court.  Counsel need only look to the language of the
district court's referral to determine whether the issue was
properly reviewable by a district court under §1336(b).  If the
issue was not one specifically referred to the ICC by the
district court, it would be reviewable only by the court of
appeals.  This regime would eliminate uncertainty among the
parties and obviate complicated inquiry over the exact source of
the ICC's authority to determine a separate issue, be it the
referral, a separate proceeding, or some other statute.

Because the propriety of Panther Valley's practices
was not an issue referred to the ICC by the district court, I
conclude that the appeal of that issue should have come directly
to the court of appeals.  For this reason, I find that the
district court should not have heard the appeal from the ICC and
I respectfully dissent.